RAINIER COMPANIES, INC. (formerly Sicks' Rainier Brewing Co.), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rainier Cos. v. Commissioner
Docket No. 6870-71.
United States Tax Court
T.C. Memo 1977-351; 1977 Tax Ct. Memo LEXIS 88; 36 T.C.M. (CCH) 1404; T.C.M. (RIA) 770351; October 3, 1977, Filed *88 This case, originally decided in 61 T.C. 68 (1973), is before us on remand in part from the U.S. Court of Appeals for the Ninth Circuit, Rainier Companies v. Commissioner, an unreported opinion (9th Cir. 1976). Our holding that a transfer to the City of Seattle was in no part a gift due to a lack of donative intent was reversed and we were directed to determine the amount of charitable contribution which petitioner made. Held: while under the valuation procedures utilized to value the land the stadium had no value, there was a bargain element in the sale of the land. Held,further, the value of this bargain element is $100,000. F. A. LeSourd, for the petitioner. Richard J. Shipley, for the respondent. IRWIN
SUPPLEMENTAL MEMORANDUM OPINION IRWIN, Judge: Our original opinion in this case (61 T.C. 68) was filed on October 23, 1973. The decision dealt with three issues, to wit: (1) Whether petitioner's sale of its baseball stadium site to the City of Seattle was an involuntary conversion under threat of condemnation entitling petitioner to defer recognition of the gain under section 1033; [1]
(2) Whether *90 petitioner's alleged donation of stadium improvements to the City constituted a charitable contribution under section 170; and (3) Whether petitioner realized ordinary income of $5,000 under section 1245 upon transfer of personal property to the City in connection with the stadium sale. In our original decision this Court held (1) that the stadium property was not sold to the City under threat or imminence of condemnation; (2) that petitioner did not make a charitable contribution to the City because it lacked the requisite donative intent; and (3) that petitioner did not recognize any ordinary income under section 1245(a) as a result of its transfer of personal property to the City. Petitioner appealed from our decision on issues (1) and (2) to the Court of Appeals for the Ninth Circuit. That court affirmed our original opinion on the nonapplicability of section 1033, but reversed our finding that the transfer was not a charitable contribution due to the lack of donative intent on the part of the petitioner. More specifically, the Circuit Court stated: All *91 of the evidence presented below supports the appellant's contention that the gift of the stadium to the city was not in anticipation of greater saleability of the underlying land nor of any other benefit to Rainier. Mr. Ferguson, the president of Rainier at the time of the sale, testified that the stadium was given to the city so that baseball could be continued in Seattle. The Mayor of Seattle testified that the city had no interest in purchasing the stadium but only the land itself and that the Rainier Company gave the stadium to the city for the civic purpose of providing a place for baseball to be played in the city. Given that the city would not purchase the stadium but was interested in the land only, it is clearly contrary to the evidence to say that the stadium was an additional inducement to the city to purchase the land itself. Since there was no evidence in the record upon which the Tax Court could base a finding that the transfer of the stadium was other than a gift, the appellant is entitled to a charitable deduction. * * * [Rainier Companies v. Commissioner, an unreported opinion (9th Cir. 1976).] [2]
*92 We were directed to determine the amount of charitable contribution to which petitioner is entitled. Pursuant to an order of this Court the parties agreed no further evidence would be introduced, and that we could determine the amount of the charitable contribution from the existing record. However, both parties did file additional briefs. We must now determine the amount of the charitable contribution made by petitioner. Petitioner contends the value of the donated stadium and thus the amount of the contribution is $240,000 utilizing a cost approach to make the valuation. Petitioner arrives at this figure by determining the reproduction cost of the stadium and deducting therefrom an amount reflecting the depreciation and obsolescence of the existing structure. However, in the event we do not agree the cost approach is appropriate, petitioner submits alternative values contending that either an income approach or a "bargain-sale" approach is appropriate in arriving at the amount of the contribution. Using the income approach, petitioner arrives at a value for the stadium of $206,083. He arrives at this value by capitalizing a projected $28,000 rental figure for the stadium *93 over a ten-year period using a six percent capitalization rate. Petitioner submits a final figure of $100,000 should we find the appropriate valuation procedure to be that of a "bargain-sale." [3] This figure is derived from the difference between an appraisal of the land and stadium together of $1,250,000, the highest expert appraisal submitted, and the final sales price for the land alone of $1,150,000. Respondent, on the other hand, contends the stadium has no significant value, especially in light of the cost of removal which, of necessity, is an element inherent in the value of this gift. He generally disputes all of petitioner's attempts to value the stadium apart from the land and asserts that the value of the land and stadium together was approximately the same as the City's purchase price for the land alone and, therefore, the conveyance of the stadium to the City resulted in no charitable *94 contribution. It is well settled that the fair market value of a contribution made in property determines the amount of the deduction. Fair market value is defined as: the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * [Sec. 1.170-1(c), Income Tax Regs.] The question as to fair market value is one of fact. While appraisal and valuation often appear of great precision, this appearance belies the accuracy of any final determinations of value. These determinations are themselves only estimates. Any value finally determined is, in the end, simply based on the trial court's ultimate finding of fact based on the record as a whole.And these ultimate findings of fact are based upon the court's subjective judgment as to the weight given the evidence considered. Petitioner's initial contention is that the value of the stadium should be based on cost of reproduction less depreciation and obsolescence, citing *95 First Wisconsin Bankshares Corp. v. United States,369 F. Supp. 1034 (E.D. Wisc. 1973). In that case, a 52-year-old building was donated to Milwaukee County. There, as in the case before us, the market value method was used to value the underlying land. However, the court there found that same method of valuation could not be used to determine the fair market value of the building because there was no evidence of sales prices for other similar properties. The court also found the income method unavailable because the building was to be used for public purposes and, since few such buildings are ever rented, there were no comparable rental properties to be considered in the valuation process. As a result, the court found reporduction cost less depreciation constituted the only meaningful measure of market value. Whatever may have been the merits of such a method of valuation in that case, we do not believe it governs here. Rev. Proc. 66-49, 1966-2 C.B. 1257, states at section 2.07: With respect to reproductive cost as a measure of fair market value, it must *96 be shown that there is a probative correlation between the cost of reproduction and fair market value. Frequently, reproductive cost will be in excess of the fair market value. [4]
In the present case there is absolutely no correlation between reproduction cost and the fair market value of the stadium. Utilizing the cost of reproduction as the measure of fair market value generally assumes that the property being valued is worth replacing. [5] This is not the case here. It is conceded by the expert witnesses and the parties that the highest and best use of the subject real property is not as a stadium site, but rather as a shopping center. The land was valued and purchased on that basis. We do not feel we can assign a fair market value to the stadium based on a method of valuation having so little relation to the facts as they exist. Similarly, we do not believe the stadium should be valued using the capitalization of earnings method. This method is also inconsistent with the highest *97 and best use value of the land. To use this method would mean even though petitioner received a purchase price based on the highest and best use of the land, we would be valuing the stadium on some basis other than that highest and best use of the site. The land and improvements are a unit; the use of the stadium is dictated by the use of the land and the valuation procedure which we utilize must give recognition to that fact. [6]
There is another difficulty in using the capitalization of earnings method. While petitioner has provided us with projected annual rentals of the stadium, such projections ignore the fact that a portion of such rentals is necessarily attributable to a *98 use of the land. Clearly, any rental paid for the stadium's use is in part a payment for the use of the land. Since petitioner has not provided us with a method of apportioning the projected rentals between the land and the stadium, he has not carried his burden of proof and we cannot value the stadium on this basis. Rule 142(a), Tax Court Rules of Practice and Procedure.
The only remaining method of valuation available is that of "bargain-sale," that is, the difference between the value of the entire property and the amount realized. This method of valuation seems to be the best available in the case before us because it values the land and stadium on a consistent basis, recognizing the highest and best use of the land. Each of the three appraisals in the record utilized a market approach to value in order to arrive at a valuation figure for the land. Each appraisal either disregarded or assigned a zero value to the stadium in recognition of the use to which the land would be put. However, it is clear there was an element of value for the unit above the amount realized by the taxpayer. We will now proceed to assign a value to that increment. For purposes of valuation *99 we must rely on the three appraisals in evidence. All appraisers agreed the highest and best use of the site was as a community shopping center and each of them valued the site on that basis. The first appraisal, dated August 16, 1965, made at the request of petitioner's predecessor, valued the site at its highest and best use to be $1,175,000 less the cost of $28,655 for removing the stadium. The appraisal was rounded to $1,150,000. This appraisal utilized a $2 per square foot value; however, this value was qualified by stating that the actual value of the land would be significantly higher, approximately $2.25, but for the fact that "fair market value" had to be limited to $2 because at this point in time "investors seeking land for such use so far in this market are extremely reluctant to go beyond arbitrarily fixed maximums of their own making." This appraisal went on to state that "[as] time passes this limit [$2] may and probably will be exceeded." Because of the values assigned by subsequent appraisals, we find this statement to be of significance. The second appraisal, made at the request of the City of Seattle, dated September 15, 1965, assigned a value to the site *100 of $1,198,000, valuing it in its "present condition." This appraisal utilized a $2.15 per square foot value for the site and specifically noted the upward trend of land prices in the immediate area. The final appraisal, also made for the City of Seattle, dated February 10, 1967, valued the site as of January 4, 1966 (the date of conveyance), utilizing a per square foot value of $2.25 for the land if vacant and unimproved. As a result, the third appraisal assigned a total value to the site of $1,250,000. In light of the apparent trend of land values, and the specific caveat attached to the first appraisal, we adopt this final appraisal as the correct value of the stadium site on the date of conveyance. The one remaining element of value with which we must deal is the cost of removing the stadium so as to put the land in a condition to effect its highest and best use. The first appraisal deducted the removal cost from the final value it found for the land so as to arrive at a net value for the stadium site. However, the two subsequent appraisals stated that because the stadium could provide some interim use until plans could be put into effect toward utilizing the land in the manner *101 of its highest and best use, the value so provided was sufficient to offset the projected cost of removing the stadium structure. Because such a finding is consistent with our valuation of the stadium site at its highest and best use, we find it unnecessary to reduce the value of the gift by the cost of removing the stadium. As a result, we find petitioner made a charitable contribution in the amount of $100,000. Decision will be entered under Rule 155. Footnotes
1. All statutory references refer to the Internal Revenue Code of 1954 as in effect for the years in issue.↩
2. The Court of Appeals apparently felt we found the stadium provided the excess value element to the transaction. However, because our initial opinion found a lack of donative intent, we did not have to focus on the cause of any excess value which petitioner may have transferred to the City. This is made clear in our original opinion where we stated: Because donative intent on petitioner's part is lacking, the value of any benefit bestowed upon the City, either through the "donation" of the stadium or through a bargain sale, cannot constitute a deductible charitable contribution. * * * [61 T.C. at 77.] Thus, while the Court of Appeals spoke of the stadium as the subject of the gift, the essential element of its holding, and the specific issue on which our prior opinion was reversed, was our finding that there could be no gift because petitioner lacked the requisite donative intent. Having been reversed on that issue we feel we must now determine what constituted the gift element, if any, of the transaction. Once this is done, we can then proceed to determine the amount of the contribution.↩
3. It should be noted that the significance of the term "bargain-sale" in this opinion is limited to valuation. There was no bargain-sale basis provision in the Code in the taxable years at issue. Section 1011(b). Cf. Potter v. Commissioner,38 T.C. 951↩ (1962).
4. Stratton v. Commissioner,T.C. Memo. 1969-50 (1969), affd. per curiam 422 F. 2d 872↩ (2d Cir. 1970).
5. Bonbright, Valuation of Property, p. 159 (1937).↩
6. Three appraisals were made for the purpose of this litigation. None of them utilized an income capitalization approach in arriving at a final value. Indeed, with respect to the income capitalization approach petitioner's own witness stated: The income production potential of the Sicks' Stadium property has been explored at some length and it is concluded that the stadium is unable to produce enough income to even satisfy the requirements of the land let alone return anything to improvements.↩